# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs February 13, 2013

## STATE OF TENNESSEE v. MOUSEN YISAK ADEN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2006-C-1955     Mark J. Fishburn, Judge**

_____

**No. M2011-02463-CCA-R3-CD - Filed February 19, 2013**

_____

A Davidson County jury convicted the Defendant, Mousen Yisak Aden, of aggravated robbery. The trial court sentenced the Defendant to eleven years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to support his conviction and that his sentence is excessive. After a thorough review of the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JERRY L. SMITH and JEFFREY S. BIVINS, JJ., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the appellant, Mousen Yisak Aden.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Rob McGuire, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This cases arises from the Defendant's alleged participation in the armed robbery of the victim, Said Ahmud. A Davidson County grand jury indicted the Defendant for aggravated robbery. At the trial on these charges, the parties presented the following evidence: The victim, Said Ahmud, testified that, in April 2006, he was preparing to leave for a two and a half month vacation visiting family in Germany. The victim had packed his bags and was preparing to drive to the airport in Atlanta, Georgia, in his 2001 Infiniti I30. He explained that he had a large sum of cash on his person to cover his expenses while

abroad, a cellular phone, immigration papers bearing his full name, and "travel items." On April 19, 2006, at around 4:30 p.m., the victim drove to pick up his cousin, who was going to drive him to Atlanta for his flight. The victim stopped at a McDonald's near his cousin's house to order food. He explained that, after he received his sandwich, he parked in a nearby parking lot to eat.

The victim testified that, as he was eating his sandwich, two black men approached his car. The shorter of the two men, which the victim identified in court as the Defendant, pulled up his shirt to expose a gun while stating, "Hey, sir, get out of the car if you don't want to get shot." The victim said that he told the Defendant, "Okay, you can have everything, just, please, don't shoot me." The victim removed the keys from the ignition and opened the car door. The Defendant "slapped" the keys from his hand and pointed a gun at the victim. The other man, who was taller than the Defendant, walked to the passenger side of the car to get inside and told the Defendant, who remained by the driver side door, to "Shoot him; shoot him." The victim said this "freaked [him] out," so he grabbed the gun and it fired. The two men began "tousling," and the gun fired again. The victim said that he was holding the gun against himself while the Defendant still had control of the trigger on the gun. He said the Defendant shot at the victim's feet twice while the victim tried to hold the gun away from himself. The victim hit the Defendant with his elbow and the gun fell. The man who had walked to the passenger side returned to the driver side and pushed the victim down to the ground allowing the Defendant to recover the gun. Both of the men then got into the victim's Infiniti, and the Defendant drove the car away.

The victim testified that he never saw the taller of the two men display a weapon. After the men fled in his car, the victim ran to the closest store, a hair salon, and dialed 911. When police officers arrived, the victim provided his insurance card, and the police officer obtained the VIN number and license plate number for the victim's car.

The victim testified that, two days later, an Ohio state police officer notified him that his car had been recovered. The victim said that he traveled to Ohio and found that his car was "really messed up" and a "total loss." He estimated the car's worth at $15,000.00 and said that his insurance company provided him with $12,000.00 for the loss of his car. The victim was able to recover his travel documents, "I-94," and cellular phone. The victim recalled that he was asked to view a photographic lineup to see if he recognized either of the two men involved in the robbery. The victim identified two pictures he believed could be photographs of the Defendant.

On cross-examination, the victim testified that, on the day of the robbery, he had $5500.00 in cash in the car glove compartment. He planned to give the money to his cousin, who would wire the money to the victim during his trip to Germany. The victim agreed that

he did not initially tell police officers at the scene about the taller man's statement to shoot the victim, but explained he did not do so because he was "in shock." The victim agreed that, when showed the photographic lineup on May 1, 2006, he selected two photographs because those two looked so similar that he was "unsure." When he was in the courtroom the day before the trial, more than four years after the robbery, he saw the Defendant, and was "a hundred-percent sure" the Defendant was the shorter man who pointed the gun at him on April 19, 2006.

On recross examination, in response to further questioning about his identification of the Defendant in court the day before, the victim said "[A]s soon as I seen his face yesterday, as soon as I walked up to the court, I knew that was him." The victim said this was his first opportunity to see the Defendant in person since the day of the robbery. The victim said that the photographic lineup was composed of black and white photographs and the two photographs he selected were "almost the same." The victim affirmed that he did not have "any doubt" that the Defendant was the man who robbed him on April 19, 2006.

David Achord, a Metropolitan Nashville Police Department detective, testified that he investigated this robbery. He explained that the Defendant was developed as a suspect in the April 19, 2006 robbery when he was apprehended two days later in Ohio in possession of some of the victim's belongings. After speaking with Ohio police, Detective Achord developed a photographic lineup that included a picture of the Defendant taken during the booking process in Ohio. Detective Achord said that, normally, photographic lineups are created in color, however, due to the fact that the photograph was from another jurisdiction and there were minor discrepancies, he believed using black and white would create a more neutral lineup. He then described to the jury the process for showing a victim a photographic lineup which included instructions on the viewing process. He showed the lineup to the victim on May 1, 2006, and the victim made a "tentative selection" of two of the photographs.

By agreement of the parties, the State read into evidence the deposition testimony of Ronnie Thornton, a Genoa Township, Ohio, Police Department officer. Officer Thornton testified that, at approximately 3:50 p.m. on April 21, 2006, he observed an Infiniti with a light blue license plate cover which was in violation of Ohio state law. The officer drove up behind the car and entered the license tag number into his onboard computer system. The tag number returned with an indication that the car had been reported stolen. Officer Thornton said he then requested the police dispatcher confirm the information. After confirming with dispatch that the Infiniti had been reported stolen, Officer Thornton pulled in behind the Infiniti as the two cars approached a red light. Officer Thornton said that the driver of the Infiniti, later identified as the Defendant, proceeded through the red light, at which point he initiated a police pursuit. Officer Thornton pursued the Infiniti with his

3

emergency equipment activated for two to two and a half miles. Officer Thornton described the area of the pursuit as having "very heavy" traffic at that time of day. The Defendant drove at high rates of speed and, ultimately, two other vehicles were struck by the Defendant. The pursuit ended when the Defendant flipped his vehicle.

Officer Thornton testified that he parked his police car next to the Infiniti and could see the Defendant, the sole person in the car, still seated in the driver's seat. After the Defendant was taken into custody, officers searched the Infiniti and recovered a fully loaded .45 caliber handgun lying on the floorboard, a half-opened box of shells of the same caliber, cellular phones, and travel documents under the victim's name.

Officer Thornton testified that he transported the Defendant for booking and processing the arrest. After administering the *Miranda* rights twice, once verbally and once in writing, Officer Thornton questioned the Defendant about the pursuit and stolen car. Officer Thornton said that the Defendant "felt the whole incident was really funny, it was a real joke." The Defendant also told Officer Thornton that, "[i]f I was on a motorcycle, you never would have caught me." Later, after booking the Defendant, Officer Thornton again asked the Defendant why he stole the vehicle. The Defendant told Officer Thornton that he had been homeless for several weeks in Tennessee after leaving the state of Washington and "he had to do something."

The Defendant testified regarding the circumstances that brought him to Nashville. He said that he had been living with his family in Washington state until he and his mother had an argument that resulted in her "kicking" him out of her home in "late February, March." The Defendant said that, with no place to go, he returned to Nashville where he had previously lived in the mid-90s. Upon his return, he lived "on the streets" and sold crack cocaine in order to eat. The Defendant said that he had been in Nashville for "a couple of weeks" when he negotiated an exchange with a "crack addict" of an eight ball for the addict's car. Because of the Defendant's belief that "[n]o one would be selling a car for an eight ball," he thought the car was "probably stolen or whatever."

The Defendant testified that he had lived in Columbus, Ohio, from 1998 to 2005. With his newly acquired car, he decided to return to Columbus to see if he might find a place to stay with friends. The Defendant said he had been in Ohio for a day or two when he was sitting at a stop sign and a police car pulled behind him. He said he was not doing anything wrong but knew he "was in a stolen car." The Defendant made a right turn, as did the police car. After the turn, the police car passed him. The Defendant continued around the block making several more right turns until he saw the lights from a police car. The Defendant explained that, because the car was not his, he "took off running." Additionally, the Defendant possessed marijuana and a gun. After approximately two miles, the Defendant

4

ran a red light, "hit a couple of cars," and the car he was driving flipped three times.

The Defendant said that Officer Thornton asked the Defendant if he knew the car he had been driving was taken during an armed robbery, and the Defendant denied any knowledge of that fact. The Defendant said that he refused to answer any of Officer Thornton's questions and was feeling "dizzy disorientated" from the accident. The Defendant denied robbing the victim.

On cross-examination, the Defendant testified that an eight ball of cocaine weighs approximately 3.5 grams and was "worth" $180.00. The Defendant maintained that he traded $180 worth of crack cocaine for the Infiniti automobile. The Defendant said, at the time he received the car, he knew it was stolen but did not know that the car was taken during a robbery.

Based upon this evidence, the jury convicted the Defendant of aggravated robbery. The trial court sentenced the Defendant as a Range I, standard offender to serve eleven years in the Tennessee Department of Correction. It is from this judgment that the Defendant now appeals.

## II. Analysis

The Defendant argues that the evidence presented at trial is insufficient to support his conviction and that his sentence is excessive.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient because the contradictory testimony about his identity undermines the validity of the conviction. The State responds that the proof supports the jury's finding of the Defendant's guilt beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct

evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction for aggravated robbery, as relevant to this case, requires proof beyond

a reasonable doubt that the Defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and that the robbery was "accomplished with a deadly weapon or by display of any article fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. §§ 39-13-401(1), -402(1) (2010).

The evidence, viewed in the light most favorable to the State, proves that the Defendant approached the victim who was seated in his car eating a sandwich. The Defendant ordered the victim out of the car while displaying a gun and threatening to shoot the victim if he did not comply. The Defendant pointed the gun at the victim as he exited his vehicle. After a struggle between the Defendant and the victim over the gun, the Defendant drove the victim's car away. Two days later, when police identified the stolen vehicle and attempted to pull the car over, the Defendant led police on a high-speed chase in a high traffic area, resulting in two other cars being hit and the Defendant ultimately flipping the victim's car. After his arrest, in response to a question about why the Defendant would take the car at gunpoint, the Defendant explained that he was homeless and "had to do something." Although the victim could not positively identify the Defendant from a photographic lineup, he identified the Defendant with certainty in court as the man who had the gun and drove away in his car. This evidence is sufficient to prove that the Defendant intentionally or knowingly took the victim's car by placing him in fear with the use of a gun.

The Defendant asserts that contradictory testimony about his identity undermines the validity of the conviction. Specifically, he points to the victim's inability to identify him in the photographic lineup as providing reasonable doubt. We acknowledge that the identity of a perpetrator is an essential element of any crime. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). Issues regarding identity, however, are questions of fact to be determined by the jury. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). Any conflicts in witness testimony regarding the identity of the accused and the weight to be afforded the testimony are issues resolved by the jury. *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn Crim. App. 1994).

We note that the circumstances surrounding the photographic lineup were throughly explored on cross-examination during the trial. The jury heard this testimony and, by its verdict, did not find that the inconsistencies warranted acquittal. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. The jury had ample evidence upon which it could conclude that the Defendant was the man who approached the victim's car with a gun and drove away in the victim's car. The victim recognized the Defendant in court as the robber. The Defendant was found two days later in possession of the stolen vehicle, which allows for the inference that he stole the vehicle. *See Bush v. State*, 541 S.W.2d 391, 394 Tenn. 1976 (holding possession of recently-stolen property gives rise to an inference that the possessor stole it). After his arrest, the Defendant

made incriminating statements to police about his involvement in the robbery. A reasonable juror could infer that the Defendant committed the aggravated robbery of which he was accused. Accordingly, the evidence is sufficient to support the Defendant's conviction, and he is not entitled to relief on this issue.

## B. Sentencing

The Defendant argues that the trial court erred when it enhanced his sentence above the minimum within the applicable range for a Range I, standard offender. The State responds that the trial court considered the purposes and principles of sentencing and imposed a lawful sentence, eleven years, which was within the applicable range. Again, we agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004).

Before the 2005 amendments to the Sentencing Act, both the State and a defendant could appeal the manner in which a trial court weighed enhancement and mitigating factors applied to the defendant's sentence. T.C.A. § 40-35-401(b)(2) (2004). The 2005 amendments, however, deleted, as grounds for appeal, a claim that the trial court did not properly weigh the enhancement and mitigating factors. *See* 2005 Tenn. Pub. Acts ch. 353, §§ 8, 9. As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2010). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Christine Caudle*, __ S.W.3d __, No. M2010-01172-SC-R11-CD, 2012 WL 5907374, at *5 (Tenn. Nov. 27, 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

8

A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980).

The "presumption of reasonableness" applied to sentences imposed by trial courts "'reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case.'" *Susan Renee Bise*, 380 S.W.3d at 703 (quoting *Rita v. United States*, 551 U.S. 338, 341 (2007)). A presumption of reasonableness "simply recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of [sentencing purposes] in the mine run of cases, it is probable that the sentence is reasonable." *Rita*, 551 U.S. at 350-51.

Before imposing a sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2010); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401 (2010), Sentencing Comm'n Cmts.

A trial court must impose a sentence within the applicable range of punishment, determined by whether the Defendant is a mitigated, standard, persistent, career, or repeat violent offender. T.C.A. § 40-35-210(c)(2010). "The trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act]'" as set forth in Tennessee Code Annotated §§ 40-35-102 and -103. *Carter*, 254 S.W.3d at 343 (quoting T.C.A. § 40-35-210(d)(2010)). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated § 40-35-102(1)(2010), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated § 40-35-102(3)(2010), and consideration of a defendant's "potential or lack of

potential for . . . rehabilitation," Tennessee Code Annotated § 40-35-103(5)(2010).

At the sentencing hearing, the parties agreed that the Defendant should be sentenced as a Range I, standard offender despite his prior record in Ohio. A Range I sentence for the Defendant's conviction, an aggravated robbery, Class B felony, is eight to twelve years. T.C.A. § 39-13-402 (2010); §40-35-112(a)(2)(2010).

In determining the appropriate sentence for the Defendant's conviction, the trial court considered the evidence presented at trial and the sentencing hearing, the presentence report, statutory sentencing principles, the parties' arguments, nature and characteristics of the conduct, enhancement and mitigating factors, the Defendant's potential for rehabilitation, and the general purposes of the Sentencing Reform Act as set forth in Tennessee Code Annotated section 40-35-102. The trial court noted that the parties agreed that the Defendant should be sentenced as a Range I, standard offender with four or five "apparent prior felony convictions."

The trial court then considered enhancement factors and found enhancement factor (1), that the Defendant has a previous history of criminal convictions and behavior in addition to those necessary to establish the appropriate range. T.C.A. § 40-35-114(1)(2010). As to its application, the trial court stated, "[The Defendant has] a number of different felony convictions, it's just unclear as to whether or not it would affect his range of punishment, [and] since it does not, all of them would be considered in terms of assessing where he should be within the range one category." The trial court also found that the Defendant was a leader in an offense involving another criminal actor. T.C.A. § 40-35-114(2)(2010). The trial court specifically applied this factor based on testimony that two men participated in the robbery, and the Defendant exposed the gun to the victim, ordered him out of the car and was the "primary person who carried out the robbery." The trial court found no other enhancement factors applicable. It further stated that it did not find any mitigating factors applicable.

The trial court considered the Defendant's mental and physical condition and found him to be "average" with no "impairing affect on his ability to be productive in society." The trial court considered the Defendant's work and educational history and found that the Defendant was twenty-three years old and "has not worked at all in his life." The trial court considered and noted the scant information on the Defendant's character and social history. The trial court, in considering family and community support, noted that the Defendant's mother had traveled to Tennessee to be present in court for the sentencing hearing but found that the Defendant had no support or ties in Nashville. The trial court declined to find that the Defendant failed to comply with any court-ordered programs due to the ambiguity of the record. It further stated, however, that the trial court did find that "because of [the

10

Defendant's] continued incarcerations for numerous crimes that he's accumulated over the last three years he's been unable to be placed on any type of probation to see . . . whether or not he could have complied with these court-ordered programs." The trial court noted that the Defendant admitted the use of marijuana and cocaine and had never "initiated" rehabilitation. The trial court considered the Defendant's record of criminal activity which included an arrest or conviction on eight separate cases, many of which had multiple charges. The trial court stated that the Defendant's "criminal history for a young person is not only extensive, it is also pretty serious." The trial court found that eleven years was the "least severe measure necessary to achieve the purpose for which it is being imposed."

We conclude that the trial court imposed a within-range sentence based upon application of two enhancement factors and consideration of the purposes and principles of sentencing. The trial court conducted a thorough review of the Defendant's case and circumstances guided by the relevant legal principles. Accordingly, the trial court did not abuse its discretion when it sentenced the Defendant to eleven years for his aggravated robbery conviction. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record before this Court, we hold that the evidence is sufficient to sustain the Defendant's conviction and the trial court properly sentenced the Defendant. The judgment of the trial court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE

11